Argued and submitted November 21, 1980, reversed and remanded
for further proceedings February 9, 1981

In the Matter of the Compensation of
Elrie Pumpelly, Claimant.

PUMPELLY,
*Petitioner,*

*v.*

STATE ACCIDENT INSURANCE
FUND CORPORATION,
*Respondent.*

(No. 78-6010, CA 18385)

623 P2d 677

Robert W. Muir, Albany, argued the cause for petitioner. With him on the brief was Emmons, Kyle, Kropp & Kryger, P.C., Albany.

Richard D. Barber, Jr., Certified Law Student, State Accident Insurance Fund Corporation, Salem, argued the cause for respondent. On the brief were K. R. Maloney, General Counsel, James A. Blevins, Chief Trial Counsel, and Darrell E. Bewley, Appellate Counsel, State Accident Insurance Fund Corporation, Salem.

Before Richardson, Presiding Judge, and Thornton and Buttler, Judges.

BUTTLER, J.

BUTTLER, J.

This aggravation claim under the Workers' Compensation Act comes to us in a peculiar posture. The referee denied the aggravation claim on the ground that claimant had not shown any worsening of her condition subsequent to the last award of compensation in March, 1976, but concluded that claimant is entitled to receive medical services because her present symptoms were shown to have been medically related to her original 1973 compensable injury. The Board affirmed the denial of the aggravation claim, but reversed the referee's determination that claimant was entitled to medical services. We reverse and remand with instructions to accept claimant's aggravation claim.

Claimant sustained a compensable injury in June of 1973 after using a heavy electric hand sander over a period of four consecutive days. Her initial complaints related to swelling and acute pain and numbness in her right hand. She consulted an orthopedic surgeon, whose tentative diagnosis was acute calcific deposit of the hand. On September 10, 1973, the doctor found claimant to be medically stationary and discharged her to return to work with limitations relating to heavy usage of her hand. However, her symptoms continued, and on October 4, 1973, SAIF withdrew its request for a determination. Claimant continued seeing her doctor, who then suspected a carpal tunnel syndrome and referred her to a neurologist for conduction studies (apparently an electromyogram); he reported normal findings. On November 21, 1973, her treating doctor again considered claimant medically stationary, but stated that a final diagnosis was difficult; in fact, none was apparently ever made.

A determination order followed on December 28, 1973, awarding no permanent disability. A hearing was requested and convened on January 29, 1975; however, because of claimant's continued symptoms, the hearing was held open for additional medical examination, including neurological examinations requested by the referee. The report of one neurologist reflected a borderline slowing of the right ulnar nerve outlet, and a nerve conduction velocity study resulted in a diagnosis of a probable thoracic outlet

problem. Another neurosurgeon, to whom claimant was referred, reported that he had not been able to complete an examination of claimant.

Finally, in February, 1976, claimant executed an affidavit, which her attorney forwarded to the referee, requesting that an opinion and order be entered. In that document, she stated that she did not want to undergo anymore "shock tests" (apparently referring to electromyograms) and that the latest neurosurgeon to whom she had been referred wanted to administer such tests to her, anticipating surgery to alleviate the pains in her arm and shoulder. She further stated that in light of the fact that none of the doctors she had consulted had been able to diagnose her problems, she was not inclined to submit to surgery. An opinion and order was then entered on March 3, 1976.

At that hearing, claimant testified that, in addition to the hand and wrist complaints noted originally, she has had, from the time of the injury, aching in her right arm from the shoulder down, and that her arm got numb and ached. The fact that these complaints did not appear in the prior medical reports is the focus of the present dispute. However, the referee in 1976 expressly stated that claimant was "fully credible" and that the medical reports referred to "chief complaints" as being those related directly to her right hand and wrist. The referee accepted those complaints as being attributed to the 1973 industrial injury, but, apparently because of claimant's refusal to submit to further electromyograms, concluded as follows: "I do not consider the medical record sufficient to support an award of disability in the unscheduled area. I conclude that the impaired function of the hand reflects a permanent disability * * *," and awarded claimant 45 degrees, equal to 30 percent loss of the right hand. There was no appeal from that order.

At the time of the 1975-76 hearing, claimant was working full time as a clerk at the Jackson County Courthouse, which required a substantial amount of writing. She was able to handle the work reasonably well, but when her hand symptoms became exacerbated, she had to discontinue her work for the rest of the day. Shortly after the

1976 order, she quit that job because it tended to cause her hand and arm to hurt too much. She remained unemployed until January of 1977 when she began working as a waitress. At first, she worked five nights a week, but soon was forced to reduce her work to three nights a week because of recurring problems with her arm and hand.

In November, 1977, claimant saw another doctor, complaining of her right arm numbness and pain radiating to the fingers; his diagnosis was cervical strain with brachial plexus neuralgia. She submitted this aggravation claim in December, 1977; it was denied by determination order dated July 19, 1978. She received manipulative treatments from that doctor, and, when no apparent relief occurred, she went to another doctor in August, 1978 for treatment. In February of 1979, that doctor advised her to stop working altogether because the work was undoing any progress his treatment was providing. Claimant did quit work at about that time.

Subsequently, in May and July of 1979, claimant was examined by another orthopedic surgeon, whose diagnosis was chronic strain of the cervical thoracic spine. In short, all three of these post-hearing doctors concluded, generally, that claimant's problem was a chronic cervical thoracic strain, and that the condition was related to the 1973 compensable injury.

In January, 1980, a hearing was held on the July, 1978, denial of claimant's aggravation claim. The referee accepted the fact that claimant's present symptoms are related medically to the industrial injury in 1973; however, he concluded that there was no evidence of aggravation of those symptoms since the last determination order in March of 1976. Therefore, he denied the aggravation claim but, because medical causation had been established, he allowed claimant medical services for her present condition.

The Board, in denying all relief, pointed out that the doctors who diagnosed claimant's condition subsequent to the 1976 order did not examine her until four or five years after the injury, and that she had never filed a claim for cervical thoracic strain.

■ It is apparent that something has gone awry, at least partly as a result of the insistence of claimant that her original claim be closed in 1976. As the referee in the hearing on this aggravation claim observed, the claim was either closed prematurely or there was a misdiagnosis. He felt that he was precluded from going behind the March, 1976, order by virtue of our opinion in *Bowser v. Evans Products Co.,* 17 Or App 542, 522 P2d 1405, *reversed and remanded on other grounds* 270 Or 841, 530 P2d 44 (1974). In our view, however, our opinion in *Bowser* would only require the conclusion that any determination made in the prior order is *res judicata.* Here, the March, 1976, order did not determine the diagnosis of claimant's injury — there had only been a tentative diagnosis as of that time. That order, however, is *res judicata* as to the existence of the symptoms involving claimant's arm and shoulder following the compensable injury — a fact which SAIF now disputes.

Having reached that conclusion, it follows that the Board's statement that claimant has never filed a claim for cervical thoracic strain is not determinative of the question. Her claim included all of the symptoms which are now said to be the result of that condition. Even if we treat the March, 1976, order as denying any claim for unscheduled disability, if there has been a worsening of those symptoms since March, 1976, claimant has established an aggravation of whatever the compensable injury was, however it may be characterized.

■ On *de novo* review, we conclude that: (1) the referee's order of 1976 determined that claimant's symptoms of pain in her shoulder and arm were probably reported to her initial treating physician, but that those complaints were not noted because of the overriding and more acute pain in her hand and wrist; (2) as of the date of the 1976 referee's order there had been no definitive diagnosis of claimant's injury; (3) the referee's refusal to award claimant any permanent disability for an unscheduled area was based upon a lack of medical information to support any permanent award; (4) the causal connection between claimant's present symptoms and the 1973 compensable injury has been established by medical evidence, and (5) although there is no medical evidence that claimant's

condition has worsened since the last determination order in 1976, the evidence that subsequent to that order claimant had to curtail her work activities and finally quit working because her condition worsened and made it too painful for her to continue, is sufficient to establish an aggravation of the 1973 compensable injury.

It follows that this case must be remanded with instructions to SAIF to accept claimant's aggravation claim.

Reversed and remanded for further proceedings.